UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTHONY CRIVELLO RUSSO,

                 Plaintiff,

    -v-

JOHN DIMILIA, *sergeant*, DARRELL ALGARIN,
*police officer*, and MICHAEL GUEDES, *police
officer*,

                 Defendants.

Case No. 07-CV-5795 (KMK)

<u>OPINION AND ORDER</u>

---

<u>Appearances:</u>

Anthony Crivello Russo
Malone, New York
*Pro Se Plaintiff*

Brian S. Sokoloff, Esq.
Kiera J. Meehan, Esq.
Steven C. Stern, Esq.
Sokoloff Stern LLP
Westbury, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Anthony Crivello Russo ("Plaintiff"), proceeding pro se, brings this action

against Defendants John DiMilia ("DiMilia"), Darrell Algarin ("Algarin"), and Michael Guedes

("Guedes") (collectively, "Defendants"), alleging that Defendants violated Plaintiff's federal

constitutional and state law rights in the course of arresting him on December 24, 2004, and

seeking to recover damages under 42 U.S.C. § 1983 and state law.  On June 12, 2008, the Court

dismissed all of Plaintiff's claims, except for his claim that Defendants used excessive force in

violation of the Fourth Amendment.  Both Parties now move for summary judgment on the

remaining excessive force claim.  For the reasons stated herein, Plaintiff's motion is denied, and

Defendants' motion is denied in part and granted in part.

## I.  Background

### A.  Factual Background

#### 1.  Defendants' Version of the Events of December 24, 2004

On December 24, 2004, shortly before 6:00 a.m., the Wallkill Police received a report "that a man had threatened to shoot the clerk" of a local Getty Mart.  (Defs.' Am. Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Defs.' Am. 56.1") ¶ 4.)  Dispatch advised Algarin, a Wallkill police officer, (*id.* ¶ 2), of the incident, and gave him a description of the customer's vehicle, (Decl. of Kiera J. Meehan ("Meehan Decl.") Ex. G, at 521).[1]  While responding to the dispatch call, Algarin observed a vehicle ("Plaintiff's vehicle") matching the physical description and license plate number of the customer's vehicle.  (*Id.* at 522.)  The suspect vehicle was being operated by Plaintiff.  (Defs.' Am. 56.1 ¶ 8.)  Algarin followed Plaintiff's vehicle with his patrol car's overhead lights, spotlight, and siren activated.  (Meehan Decl. Ex. G, at 523-26.)  Plaintiff did not respond to Algarin's lights and siren, nor did he speed up or try to outrun Algarin, but instead continued at approximately 15-20 miles per hour.  (*Id.* at 524-26, 580.)  Algarin testified that although Plaintiff did stop at stop signs, (*id.* at 528), Plaintiff operated his vehicle "in a very erratic manner," including crossing the double yellow line, driving in the oncoming lane, and almost colliding with another vehicle, (*id.* at 523-24, 529-30.)  After Algarin had followed Plaintiff for approximately 1.5 miles with his lights and siren activated, (*id.* at 584), Plaintiff turned into the driveway of his home, 7 Marcy Lane ("the driveway"), (Defs.' Am. 56.1 ¶ 9).

---

[1] Exhibit G to the Meehan Declaration is the testimony of Algarin on June 27, 2005, at Plaintiff's criminal trial.

After the initial call came into dispatch and after Algarin left the police station, Guedes, a

Wallkill police officer, (*id.* ¶ 3), also left and drove towards the Getty Mart, where he understood

that a clerk had been threatened by a person who had a gun, (Meehan Decl. Ex. H, at 706-07).[2]

After receiving additional dispatch calls, Guedes redirected his approach and joined Algarin in

following Plaintiff's vehicle until it stopped in the driveway.  (*Id.* at 707-10.)  Guedes also

activated his overhead lights during the pursuit and testified that Plaintiff did not stop at stop

signs.  (*Id.* at 710.)  DiMilia, a sergeant with the Wallkill Police Department, (Defs.' Am. 56.1 ¶

1), left the police station after listening to the entire initial dispatch call and, based on Algarin's

radio transmissions, joined the pursuit of Plaintiff's vehicle behind the patrol cars of Algarin and

Guedes, (Meehan Decl. Ex. F, at 397-400).[3]  Another police officer, Kelly Boss ("Boss"), also

joined the pursuit in her patrol car.  (*Id.* at 401.)  Boss is not a defendant in this case.

Plaintiff stopped in the driveway, and Algarin pulled his car in behind Plaintiff's vehicle,

exited his patrol car, turned his spotlight on Plaintiff's vehicle to illuminate the area, drew his

weapon, and approached the driver's side of Plaintiff's vehicle yelling "Let me see your hands"

and "Exit the vehicle."  (Meehan Decl. Ex. G, at 530-31.)  Algarin testified that as he

approached, he saw Plaintiff reach into the passenger side and pull up a rifle, at which point

Algarin "started to yell, 'Gun, gun,' and retreated" to his car for cover, not knowing what

Plaintiff was going to do with the rifle.  (*Id.* at 531, 586.)  As Algarin yelled to Plaintiff to show

his hands, Plaintiff continued to reach for the rifle.  (*Id.* at 531.)  When Algarin took cover, he

---

[2] Exhibit H to the Meehan Declaration is the testimony of Guedes on July 1, 2005, at
Plaintiff's criminal trial.

[3] Exhibit F to the Meehan Declaration is the testimony of DiMilia on June 27, 2005, at
Plaintiff's criminal trial.

could not see the other officers.  (*Id.* at 532-33.)

Algarin further testified that after he retreated, he observed Plaintiff, who had exited his
vehicle with the rifle in his right hand pointing down, spin around.  (*Id.* at 533.)  Algarin did not
hear Plaintiff say anything when Plaintiff got out of his vehicle.  (*Id.* at 590.)  Algarin yelled
"drop the gun" multiple times.  (*Id.* at 533, 575.)  Plaintiff did not comply; he continued to move
and swing the rifle in Algarin's direction, (*id.* at 575), and then "leveled the weapon directly at
[Algarin]," (*id.* at 533).  Specifically, Plaintiff "introduced his left hand to the barrel with the
stock on it and turned it in [Algarin's] direction," holding it at waist level.  (*Id.* at 535.)  At that
moment, Algarin did not know the location of the other police officers, and did not see Plaintiff
aim the gun at any of the other officers.  (*Id.* at 535, 589.)  Algarin could not see if Plaintiff's
hand was on the trigger.  (*Id.* at 588.)

When Plaintiff leveled the rifle at Algarin, Algarin opened fire.  He does not recall how
many shots he fired, although it was more than one.  (*Id.* at 533.)  At this point, Algarin was
approximately twelve to fourteen feet from Plaintiff.  (*Id.* at 536.)  When he fired his weapon at
Plaintiff, Algarin believed that a threat was imminent and that his "life was in danger."  (*Id.* at
567.)  Algarin stopped firing "[w]hen [he] saw the threat [,Plaintiff,] go down and the rifle hit
the ground," because at that time he "felt the threat was neutralized."  (*Id.* at 534, 576.)  The
evidence showed that five bullets were fired from Algarin's gun.  (*Id.* at 549.)  Algarin does not
know how much time elapsed between when he yelled for Plaintiff to drop the rifle and when
Algarin fired his weapon.  (*Id.* at 589.)

Guedes was directly behind Algarin, also on the driver's side of Plaintiff's vehicle,
(Meehan Decl. Ex. H, at 719-720), and testified to substantially the same chain of events, stating
that Plaintiff raised his rifle and pointed it in the direction of Algarin, (*id.* at 727-28).  Guedes

4

added that after Algarin ordered Plaintiff to drop his weapon, Plaintiff "refused verbally to drop the weapon," saying "no or something negative."  (*Id.* at 728-29.)  After Guedes heard multiple gunshots, the origin of which he could not determine, and observed that Plaintiff was still standing but not moving, he discharged his weapon once.  (*Id.* at 729.)  Guedes testified that he fired a shot at Plaintiff because Plaintiff "posed an immediate threat of serious physical injury or death to [] Algarin," and Guedes stopped firing his weapon "[w]hen the threat was neutralized." (*Id.* at 738.)  According to Guedes, "[i]t happened very quickly" and "was a very stressful situation," and there "was immediate shock that there were shots fired."  (*Id.* at 750.)

DiMilia pulled over along the side of the road, in front of 7 Marcy Lane, and exited and approached the passenger side of Plaintiff's vehicle.  (Meehan Decl. Ex F, at 403, 407.) DiMilia's testimony is substantially the same as the other Defendants' testimony, with the exception that he believed that Plaintiff was pointing the gun at DiMilia.  (*Id.* at 409.)  DiMilia "attempted to focus [his] sights on the target, which was [Plaintiff] holding his weapon," (*id.* at 410), but did not fire because he was unable to get the line of sight in focus, (*id.* at 441).  DiMilia added that he heard Plaintiff respond to Algarin's command to drop the rifle with "Just shoot me."  (*Id.* at 411.)

After she reached the driveway, Boss exited her vehicle and started to approach Plaintiff's vehicle.  (Tr. of Kelly Boss's Trial Testimony ("Boss Tr.") 603 (Dkt. No. 113 Ex. 1).) As she approached, she saw Plaintiff in the vehicle, and Algarin approaching Plaintiff's vehicle with DiMilia behind him.  (*Id.* at 604.)  After Algarin said that Plaintiff had a rifle, Boss attempted to focus her gun's sights on Plaintiff but was unable to do so.  (*Id.* at 622.)

After Plaintiff fell to the ground, Algarin approached Plaintiff and moved the rifle away from Plaintiff.  (Meehan Decl. Ex. G, at 541-42.)  Algarin then called into dispatch that shots

had been fired and they needed an ambulance.  (*Id.* at 542.)  DiMilia dragged Plaintiff away from

the driver's side area towards the rear of Plaintiff's vehicle, where there was more room to treat

Plaintiff's injuries.  (Meehan Decl. Ex. F, at 413.)  Guedes began to administer first aid to

Plaintiff at the instruction of DiMilia, whom Guedes observed for the first time as Guedes

reached Plaintiff.  (Meehan Decl. Ex. H, at 731.)  In treating Plaintiff, Guedes and DiMilia

observed a gunshot wound on Plaintiff's arm, a hole in Plaintiff's right forearm, and a large

wound toward Plaintiff's right shoulder.  (*Id.* at 736.)

Boss meanwhile went to the street where she heard an individual — whom she learned

was Plaintiff's tenant, Williams McDevitt ("McDevitt") — yelling.  (Boss Tr. 608-09.)  After

speaking with McDevitt for a few minutes, Boss returned to the driveway and observed a rifle at

the rear of Algarin's vehicle.  (*Id.* at 609.)  Boss then went to check on Plaintiff, who was located

between Plaintiff's vehicle and the front of Algarin's vehicle.  (*Id.* at 611.)  Boss treated

Plaintiff's injuries near his inner right elbow and on his front upper right shoulder.  (*Id.* at 620-

21.)  Boss testified that she did not see the rifle until she saw it on the ground behind Algarin's

vehicle; however, her view of Plaintiff prior to the shooting was obstructed by Algarin, and

Algarin's vehicle.  (*Id.* at 613, 622-24.)

McDevitt was a tenant who lived in the basement of Plaintiff's house at 7 Marcy Lane.

(Meehan Decl. Ex. I, at 289-90.)[4]  On the morning of December 24, 2004, McDevitt was driving

toward the house when he saw Plaintiff's vehicle pull into the driveway and one police car pull

in behind it, while the other police cars stopped in front of 7 Marcy Lane.  (*Id.* at 299.)

McDevitt got out of, and stayed next to, his car.  (*Id.*)  He saw the officers approach Plaintiff's

---

[4]  Exhibit I to the Meehan Declaration is the testimony of McDevitt on June 27, 2005, at
Plaintiff's criminal trial.

vehicle, then run back from the vehicle, and he heard them yell for Plaintiff to put down his weapon two or three times.  (*Id.* at 299, 333.)  McDevitt says that he yelled "'Don't shoot him,' about eight or nine times" and then "heard two quick pops."  (*Id.* at 300.)  He heard only two shots.  (*Id.* at 334.)  At no point during this chain of events could McDevitt see Plaintiff, as his view was blocked.  (*Id.* at 334-35.)  When the police later escorted McDevitt to the house, he walked by Plaintiff's vehicle and saw that the back window had been shot, the driver's side window was blown out with glass missing from it, and the driver's side door was open.  (*Id.* at 335.)

Plaintiff's neighbor, Everett Moore ("Moore") observed part of the incident from his house.  That morning, from approximately 120 feet away, he saw police vehicles by Plaintiff's house and saw Plaintiff standing by the driver's side of the vehicle with the door open, facing the police officers.  (Tr. of Everett Moore's Trial Testimony ("Moore Tr.") 504, 514 (Dkt. No. 113 Ex. 10).)  Moore was able to see Plaintiff's upper torso and head, which were illuminated by the police spotlight on Plaintiff, but Moore's view of Plaintiff's left shoulder and arm area was blocked by Plaintiff's vehicle.  (*Id.* at 504-05.)  Moore heard the police shouting.  (*Id.* at 506.)  After he heard the shouts, Moore saw Plaintiff take a step toward the officers, facing them, and move his right forearm in an outward direction, bringing it forward and parallel to the ground at approximately hip height; however, Moore was unable to see Plaintiff's hip area or his left side. (*Id.* at 507-08.)  Moore could see Plaintiff's right hand and did not see anything in it; he could not see Plaintiff's left hand.  (*Id.* at 518.)  Moore then heard shots.  (*Id.* at 506.)

2. Defendants' Supporting Evidence

Defendants also offered evidence from Jan Golding ("Golding"), an investigator with the New York State Police, (Meehan Decl. Ex. J, at 457-58),[5] who interviewed Plaintiff in the hospital on the morning of December 24, 2004, (*id.* at 460-61). Golding testified that he read Plaintiff his Miranda rights, and Plaintiff agreed to speak with him without an attorney present. (*Id.* at 462.) Plaintiff first told Golding that "all [Plaintiff] did was get out of [his] car and they shot [him]"; later, Plaintiff said that "he turned to walk towards his house and they started firing at him." (*Id.* at 462-63.) Plaintiff stated that he carried a rifle in his car for protection, that the police "could not have seen the rifle until [he] got out of the car," and that it was his "right to have a rifle." (*Id.* at 463-64, 475.) Plaintiff insisted that he never pointed the rifle at the police officers, and that it was "not chambered." (*Id.* at 482-83.)

During this conversation, Plaintiff was being treated by medical personnel for wounds to his hand, his arm, and a portion of his back, and was complaining about pain in his upper back. (*Id.* at 465, 470.) Golding testified that he did not know if Plaintiff had received medication. (*Id.* at 470.) A New York State Police Trooper, Thomas Fortuna, was present in the room during Plaintiff's statements and testified that when Golding asked Plaintiff what happened, Plaintiff "stated that he got out of his car and he was shot." (Tr. of Thomas Fortuna's Trial Testimony 668 (Dkt No. 113 Ex. 3).) Golding took notes on Plaintiff's statements, but he did not show Plaintiff the statement, and Plaintiff did not adopt any writing of what he had said. (Meehan Decl. Ex. J, at 478-79.)

---

[5] Exhibit J to the Meehan Declaration is the testimony of Golding on June 27, 2005, at Plaintiff's criminal trial.

Defendants also introduced testimony of Investigator Paul Langowsky ("Langowsky"), who is assigned to the New York State Police's Forensic Investigation Unit, and responded to 7 Marcy Lane after the shooting.  (Tr. of Paul Langowsky's Trial Testimony ("Langowsky Tr.") 757-59 (Dkt. No. 113 Ex. 8).)  Langowsky testified that he recovered six bullet casings in connection with this case.  (*Id.* at 760-61.)  Langowsky examined Algarin's gun, which had five bullets missing, and Guedes's gun, which was missing one bullet.  (*Id.* at 780-81.)  During Langowsky's testimony, photographs of Plaintiff's car from the date of the shooting were introduced into evidence which showed: a shattered back windshield with several bullet holes; the small window behind the rear driver's side door with shattered glass and bullet holes; the front driver's door open, with shattered glass and a bullet hole in the rubber molding at the bottom of the window; and a bullet hole in the front windshield.  (*Id.* at 766-69; People's Exs. 74-80.)  Langowsky testified that pursuant to his training, he lined a wooden dowel up with the hole in the rubber molding of the driver's door to indicate the angle of the projectile that made the hole.  (Langowsky Tr. 768-70.)  In other words, the dowel pointed in the general direction from which the bullet had come.  (*Id.* at 770.)  When Langowsky placed the dowel in the hole in the driver's door and closed the door, the dowel pointed to the rear passenger side door and also pointed through the driver's seat; however, there was no damage to either the rear passenger door or the driver's seat.  (*Id.* at 777.)

The Wallkill police vehicles were equipped with devices that began recording video when the sirens were activated.  (Meehan Decl. Ex. F, at 425-27 .)  Video recordings from three of the police vehicles (Cars 77, 81, and 85) were introduced at Plaintiff's criminal trial and have been provided to and reviewed by the Court.  (Order of Aug. 25, 2011 (Dkt. No. 107).)  The videos, which do not have any audio, depict the police vehicles following Plaintiff's vehicles at a

slow speed with their lights flashing.  The videos show that Plaintiff did not pull over or acknowledge that the police vehicles were following him, and he repeatedly swerved out of his lane.  Once the vehicles halted in the driveway, they were not pointed in the direction of Plaintiff's vehicle and, accordingly, did not capture the actual shooting.  However, the videos do show three police officers approaching Plaintiff's vehicle, then suddenly retreating and seeking cover behind a police vehicle that presumably is Algarin's.

### 3.  Plaintiff's Version of Events

Plaintiff's version of the events of that night is entirely different from that of Defendants. At Plaintiff's deposition, he testified that he "positively remember[ed] [he] did not threaten to shoot" the Getty Mark clerk, that he never told the clerk that he had a gun, and that such claims were "ridiculous" and "ludicrous."  (Examination of Anthony Crivello Russo ("Pl.'s Dep.") 60, 114 (Dkt. No. 113 Exs. 11, 12).)[6]  Plaintiff also testified that he when he drove from the Getty Mart to his home, he did not observe any vehicles behind him, see any flashing lights, or hear any sirens.  (*Id.* at 66-67.)

According to Plaintiff, he first noticed the police vehicles when he pulled into the driveway and shut off his car.  (*Id.* at 70.)  Plaintiff said that he rolled down his window and asked Algarin, who was standing by the driver's door of Algarin's vehicle, what he wanted.  (*Id.* at 72-73.)   Plaintiff further told Algarin that Algarin was trespassing and that unless he had a warrant, he should leave Plaintiff's property.  (*Id.* at 75.)  Plaintiff testified that Algarin did not respond regarding the warrant and instead, after a short delay, "yelled gun, gun, and [Plaintiff's]

---

[6] However, the Getty Mart clerk, Sohan Lal, testified at Plaintiff's criminal trial that Plaintiff appeared to be drunk when he came in the store and, when Lal refused to sell him beer, Plaintiff said he had a gun in his car and would kill Lal.  (Tr. of Sohan Lal's Trial Testimony ("Lal Tr.") 383-85 (Dkt. No. 113 Ex. 7).)

car became a pin cushion." (*Id.* at 78.) Plaintiff alleges that he did not have a chance to respond to Algarin's yelling "gun, gun" and "[t]he next thing [Plaintiff] knew [he] felt a hot piece of lead in [his] back while sitting there, in the driver's side, in the driver's seat." (*Id.* at 81.) Plaintiff felt the lead "[d]irectly in the middle of [his] back to the left of [his] spinal column. Then bullets were flying all over the inside of the car." (*Id.* at 82.) Plaintiff later reiterated that the first bullet hit him to the left of his spine. (*Id.* at 124.) Plaintiff alleged that he then turned around to his right, because his natural reaction was to turn toward what happened, and was shot five more times through the back window of the car. (*Id.* at 82-83.) Plaintiff's Affidavit similarly states that he "was sitting in his car, in his driveway and was shot down through the back window of his car . . . six times, without warning" in the center of his back, shoulder, arm, and hand, and that the police officer "yelled, 'Gun Gun!' and started firing even though there wasn't any danger from [Plaintiff]." (Pl.'s Resp. to Defs.' Statement: Undisputed Material Facts and Summ. J ("Pl.'s 56.1 Resp."), Aff. of Anthony Russo ("Pl.'s Aff.") 1.)

At his deposition, Plaintiff testified that there were many shots through the back window at "all different angles," and that he believed the windshield collapsed after the bullets went through it. (Pl.'s Dep. 115.) In addition to those in the back window, Plaintiff saw bullet holes in the driver's door, the dashboard, and one of the seats. (*Id.* at 121-22.) Plaintiff testified that he believes Algarin fired fourteen shots at Plaintiff. (*Id.* at 123.)[7]

 At Plaintiff's criminal trial, "the parties stipulated that the gunshot wound that was received by [Plaintiff] was to the right forearm, to the right arm between the elbow and shoulder, to the right shoulder and an area of the right scapula. There was a laceration to the webbing

---

[7] As previously noted, a total of six shell casings were found at the scene and Algarin's gun had five bullets missing.

between the right thumb and right index finger." (Meehan Decl. Ex. K, at 1011-12.)[8]  However, "[t]he entry and exit wounds were not stipulated into [sic]." (*Id.* at 1012.)

At his deposition, Plaintiff testified that after he was shot, "[f]rom that point on everything is blank." (Pl.'s Dep. 83.) Plaintiff first reiterated that he never got out of his vehicle and instead stated that he was told by eyewitnesses that he was taken out of the car, kicked in the ribs, and dragged to the middle of the driveway by Algarin; Plaintiff could not recall the names of these eyewitnesses but claimed that they testified to that effect at Plaintiff's criminal trial. (*Id.* at 83-84.)[9]  However, in the same deposition, Plaintiff also testified that he did not recall whether he got out of the car, but claimed that witnesses said that he did not. (*Id.* at 90.) Plaintiff indicated that one of the eyewitnesses was Moore. (*Id.* at 93.) Plaintiff remembered that Moore testified at Plaintiff's criminal trial regarding what he witnessed; however, Plaintiff did not remember the details of Moore's testimony and has never spoken with Moore about the incident. (*Id.* at 93-95.)[10]

---

[8] Exhibit K to the Meehan Declaration is the transcript of the jury charge and the reading of the jury verdict on July 5, 2005, at Plaintiff's criminal trial.

[9] The Court has reviewed the transcript from Plaintiff's criminal trial, and there is no testimony to that effect. In fact, DiMilia testified that he moved Plaintiff away from the vehicle, not Algarin. (Meehan Decl. Ex. F, at 413.) Plaintiff also now claims that DiMilia, Guedes, and Boss provided testimony that contradicted Algarin's at the trial. (Pl.'s Dep. 84-85.) The transcript, however, shows that the testimony of all four police officers was consistent with Algarin's testimony. Plaintiff also explained that he named DiMilia and Guedes as defendants because they were "part and parcel to the incident" and could have done something to stop Algarin; however, Plaintiff made clear that he is "not really concerned with anyone else but [] Algarin," who Plaintiff believes is the only person who fired any shots at him. (*Id.* at 85.)

[10] The Court also notes that Plaintiff testified at his deposition that he did not recall whether he himself testified at his criminal trial. (Pl.'s Dep. 102-03.) In addition, Plaintiff testified that he thought that his criminal trial lasted for three days and expressed surprise when he was told by Defendants' counsel that the trial took closer to two weeks. (*Id.* at 111.)

Plaintiff denied ever meeting or speaking with Golding at the hospital and, therefore, denied making the statements that Golding attributed to him.  (*Id.* at 98-100.)  In addition, Plaintiff denied ever telling anyone that he got out of the car or that he had a loaded rifle.  (*Id.* at 100.)  Plaintiff also repeatedly reiterated that he did not have a gun in the driveway.  (*Id.* at 149, 243.)  Plaintiff speculated that Algarin yelled "gun" because "he wanted to shoot [Plaintiff]," because Plaintiff is "quite notorious in [his] area as a political figure" who had written numerous stories about "dirty cops"; however, Plaintiff did not know Algarin's name prior to December 24, 2004 and had never written an article about Algarin.  (*Id.* at 78-80.)[11]  Plaintiff also claimed that two police officers and an eyewitness at the scene said that they did not see a gun, but Plaintiff did not identify these witnesses.  (Pl.'s Aff 1.)[12]  In fact, Plaintiff maintained that the other police officers established at Plaintiff's criminal trial that Plaintiff did not have a rifle.  (Pl.'s Dep. 243-44.)[13]

At various points during his deposition, Plaintiff mentioned having documentation regarding the incident and his trial "on the outside" that he was not allowed to have in jail.  (*Id.* at

---

[11] In fact, at his deposition Plaintiff testified that he "anticipated the possibility of something happening" in response to his writings about "dirty public servants"; although he "did not really think [he] would get shot, . . . there was always the possibility" and he "never traveled alone without somebody else in [his] vehicle, except for that night."  (Pl.'s Dep. 80.)

[12] The identity of these witnesses is not clear.  Of the four police officers who were at the scene, three testified that they saw the rifle; the one who did not, Boss, testified that she could not see Plaintiff's hands at any point during the incident.  If the other eyewitness at the scene is Moore, Plaintiff is correct that Moore did not see the rifle; however, Moore, who testified that Plaintiff was standing outside of his vehicle, was able to see only one of Plaintiff's hands, from a distance of about 120 feet.

[13] Plaintiff's recollection of the trial testimony (if it can be called that) is plainly incorrect.  As previously noted, Guedes and DiMilia testified at Plaintiff's criminal trial that they did in fact see the rifle.  Boss testified that she did not see the rifle because she saw only Plaintiff's head and shoulders.

110, 117-18.)  This documentation allegedly includes 911 audio tapes, video surveillance from

Algarin's police vehicle, and photographs, which Plaintiff claimed were in his sister's possession.

(*Id.* at 117-18.)  However, Plaintiff has not had contact with this sister since he entered jail in

2005 and, although he knows what town she lives in and has sent people to the town to try and

find her, he has not been able to locate her.  (*Id.* at 223, 260-62.)

       In opposition to Defendants' motion for summary judgment, Plaintiff submitted a

photograph of his vehicle after the shooting along with a textual explanation.  (Opp'n to Defs.'

Summ. J.)  The photograph shows a vehicle with several large holes in its shattered back

windshield, and an open driver's side front door with a shattered window, which is not rolled

down.  (*Id.*)  In the textual explanation, Plaintiff writes that "[i]t would be intresting [sic] to hear

how [Defendants] would explain, how [Plaintiff] was in this car being shot in back, and at [the]

same time standing outside the car facing police with a gun."  (*Id.*)  In Plaintiff's reply in support

of his motion for summary judgment, Plaintiff again contends that the photograph he submitted

"[s]hows the back window of Plaintiff's car blasted out by . . . Algarin's bullets," and that another

photograph "shows the back of Plaintiff's jacket, that Plaintiff was wearing when . . . Algarin shot

down Plaintiff through the back window, like Plaintiff was a rabid dog."  (Pl.'s Resp. in Opp'n to

Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply") at unnumbered page 2 (Dkt. No. 85).)

Plaintiff maintains that these photos "show conclusively that Plaintiff could not have been a threat

[] to anyone while sitting in his car with his back facing . . . Algarin."  (*Id.* (emphasis omitted).)

Several other letters from Plaintiff to the Court reiterate that Plaintiff was "shot six times, through

the back window of the car he was sitting in," (Letter from Pl. to Ct. (Oct. 20, 2011)), "shot down

in cold blood, without just cause, through the back window of the vehicle [he] was sit[t]ing in,"

(Letter from Pl. to Ct. (Nov. 22, 2011) (emphasis omitted)), and was shot "in the back thru [sic]

the back window of the car that [he] was sitting in," (Pl.'s Notice of Protest 2 (Dkt. No. 120)).

### 4. Plaintiff's Supporting Evidence

Plaintiff submitted the testimony of forensics expert Carl Haase, who testified at Plaintiff's criminal trial on Plaintiff's behalf regarding ballistic and trajectory analysis. Haase testified that he reviewed the grand jury testimony of some, but not all, of the witnesses in the case, and some, but not all, of the crime scene photographs and diagrams, and examined Plaintiff's vehicle and the healed wounds on Plaintiff's body. (Tr. of Charles Haase's Trial Testimony ("Haase Tr.") 832-33, 883-86 (Dkt. No. 113 Ex. 6).) Haase did not interview any of the witnesses, or review the crime scene log or the New York State Police incident report. (*Id.* at 884-94.) According to Haase, based on the crime scheme photographs, there were three distinct holes in the glass of the rear window. (*Id.* at 836.) However, at the time Haase examined the car, which was six months after the incident, (*id.* at 878-79), the holes were no longer in the same position because the rear windshield had fallen in and was completely gone, (*id.* at 833). The driver's window was also no longer in the car. (*Id.* at 875.)

Based on the photographs, Haase claimed that one bullet exited the vehicle through the hole in the front windshield, and that a second made an impact mark in the driver's door and probably ended up inside the fender and has not been recovered. (*Id.* at 837-41.) Because Haase did not find any bullets in the car and did not see any other areas where a bullet might have exited the car, he stated that the third bullet "had to have hit [Plaintiff]." (*Id.* at 841.) Haase testified that it was not possible that bullets entered the vehicle through the back window and came out through the driver's door. (*Id.* at 844.) Thus, Haase argued that the bullets that entered the back windshield could not have hit Plaintiff if he was standing outside the vehicle; instead Haase postulated that Plaintiff was hit while sitting in his car. (*Id.* at 847, 849, 907.)

15

On cross examination, Haase acknowledged that he did not view the actual holes in the rear windshield because the window was gone, and confirmed that he did not take any measurements to determine where the holes would have been.  (*Id.* at 872-73.)  According to Haase, when determining the trajectory of the bullet, the exact location of the holes is not important; instead, the fractures around the hole are better indicators.  (*Id.* at 874-75.)  Haase did not measure the hole in the front windshield — which was still intact — or place a dowel in either the front windshield hole or the hole in the small rear driver's side window.  (*Id.* at 876-78.)  Haase searched for but did not find any holes in the fabric of any of the seat cushions in the car; he also tested for blood in the car and found none.  (*Id.* at 880.)  Haase did not use any mathematical formulas or computer-generated programs to perform trajectory analysis in this case.  (*Id.* at 883.)  He also did not review the statements of Defendants regarding their locations at the time of the shooting or reports of where the rifle attributed to Plaintiff was recovered, although he acknowledged that such information could possibly be an important factor to consider.  (*Id.* at 892-95.)  Likewise, Haase did not recall being aware that Plaintiff told Golding that he was shot while walking toward his house, but conceded that a statement of that nature could possibly be important in establishing Plaintiff's position when he was shot and would be important in his evaluation.  (*Id.* at 901, 909.)

### 5.  Plaintiff's Criminal Trial

Plaintiff was indicted in 2005 in state court on three counts of criminal possession of a weapon in the third degree, nine counts of criminal possession of a weapon in the fourth degree, one count of driving while intoxicated, and one count of menacing in the third degree.  (Meehan

Decl. Ex. L.)[14]

The jury found Plaintiff not guilty of criminal possession of a weapon in the third degree, a charge which the jury was instructed required a finding: (1) that on December 24, 2004, in Orange County, Plaintiff "possessed a 30 caliber M1 carbine rifle bearing serial number 4236675 and said rifle was a deadly weapon"; (2) that Plaintiff "did so knowingly"; and (3) that Plaintiff "did so with the intent to use said weapon unlawfully against another."  (Meehan Decl Ex. K, at 1014.)  The jury did, however, find Plaintiff guilty of the lesser included charge of criminal possession of a weapon in the fourth degree, which the jury was instructed required a finding: (1) that on December 24, 2004, in Orange County, Plaintiff "possessed a 30 caliber M1 carbine rifle bearing serial number 4236675 and said rifle was a deadly weapon"; and (2) that Plaintiff "did so knowingly."  (*Id.* at 1016.)  The jury was specifically instructed that they could consider "whether [Plaintiff's] mind was affected by his consumption of alcohol to such a degree that he was incapable of forming the intent necessary."  (*Id.* at 1034.)

The jury also found Plaintiff guilty of menacing in the third degree, which charge required a finding: (1) that on December 24, 2004, in Orange County, Plaintiff "by physical menace placed or attempted to place John DiMilia in fear of death or imminent serious physical injury or imminent physical injury"; and (2) that Plaintiff "did so intentionally."  (*Id.* at 1032.)  The jury also convicted Plaintiff of the other eleven counts of criminal possession of a weapon (charges involving weapons found inside Plaintiff's house, not the rifle involved in the incident in the driveway), and driving while intoxicated.  (*Id.* at 1089-90; Meehan Decl. Ex. L.)

---

[14] Exhibit L to the Meehan Declaration is a copy of the completed verdict form in Plaintiff's criminal trial, dated July 6, 2005.

The Honorable Jeffrey G. Berry ("Justice Berry") sentenced Plaintiff on "the lesser included offense of criminal possession of a weapon in the fourth degree under the first count of the indictment" to "one year in the county jail." (Meehan Decl. Ex. N, at 15.)[15]  On the fourteenth count of menacing, Justice Berry sentenced Plaintiff to ninety days in the county jail. (*Id.* at 19.) In total, Justice Berry sentenced Plaintiff to incarceration of a minimum of two-and-a-half years and a maximum of fourteen years. (*Id.* at 20.)

B.  Procedural Background

Plaintiff filed his initial Complaint on June 19, 2007 against Algarin, DiMilia, Guedes, and three New York State Police Officers. (Dkt. No. 1.)  On September 27, 2007, Plaintiff filed an Amended Complaint. (Dkt. No. 22.)  Upon motion of Defendants, Magistrate Judge Mark D. Fox issued a Report and Recommendation ("R&R") on February 11, 2008, recommending that all of Plaintiff's claims be dismissed except for his excessive force claim against Algarin, DiMilia, and Guedes, who had not moved to dismiss that claim. (Dkt. No. 31.)  On June 13, 2008, this Court adopted the R&R in its entirety. (Dkt. No. 37.)  On September 29, 2010, Defendants filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 72.)  Plaintiff also filed a motion for summary judgment. (Dkt. No. 109.)

On August 25, 2011, the Court issued an Order directing Defendants to submit the transcript of Plaintiff's deposition in the instant action, the trial testimony of any other eyewitnesses to the events of December 24, 2004, and any expert testimony. (Dkt. No. 107.)  On September 1, 2011, Defendants provided the Court with the remainder of the transcript and exhibits from Plaintiff's criminal trial as well as the transcript from Plaintiff's deposition, which

_____

[15] Exhibit N to the Meehan Declaration is the transcript of the sentencing proceeding held in Plaintiff's criminal trial on October 7, 2005.

Defendants had taken by video conference on September 16, 2009, and October 19, 2009.

On October 5, 2011, the Court issued an Order directing the Parties to submit briefs on both the effect of the criminal trial testimony on their motions for summary judgment and the admissibility of the trial testimony.  (Dkt. No. 114.)  The Parties were also permitted to submit amended 56.1 statements.  (*Id.*)  Defendants submitted their brief and an amended 56.1 statement on November 18, 2011.  (Dkt. Nos. 125, 126.)  Plaintiff submitted a response to Defendants' amended 56.1 statement on November 30, 2011, (Dkt. No. 117), and a "Notice of Protest" on December 25, 2011, (Dkt. No. 120).  As noted, Plaintiff also has submitted several letters to the Court since October 5, 2011, detailing his version of the events of December 24, 2004.

## II.  Discussion

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a summary judgment motion, the . . . court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  "A fact is 'material' when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).

At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Westinghouse Electric Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24. "Where, as here, cross motions for summary judgment are filed, [the Court] evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (internal quotation marks omitted).

Finally, the Court is mindful that Plaintiff is pro se and that "[t]he submissions of a pro se party should be held to less stringent standards than formal pleadings drafted by lawyers." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 577 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998).  Therefore, courts must read a pro se litigant's submissions liberally, interpreting them "to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) (internal quotation marks omitted); *see also Sash v. United States*, 674 F. Supp. 2d 531,

536 (S.D.N.Y. 2009) (noting that courts "extend extra consideration to pro se plaintiffs and . . .

pro se parties are to be given special latitude on summary judgment motions" (internal quotation

marks omitted)).  If a court determines, based upon its own review of the record, that a genuine

dispute of material fact exists, "the court is not required to deem the fact admitted merely because

the nonmoving party has failed to submit a relevant counterstatement under Rule 56.1."

*Pierre-Antoine v. City of New York*, No. 04-CV-6987, 2006 WL 1292076, at *3 (S.D.N.Y. May 9,

2006).  This does not, however, "relieve [P]laintiff of his duty to meet the requirements necessary

to defeat a motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d

Cir. 2003) (internal quotation marks omitted); *see also Monterroso*, 591 F. Supp. 2d at 577

(noting that "proceeding pro se does not otherwise relieve a litigant from the usual requirements

of summary judgment" (internal quotation marks omitted)).

   B.  Analysis

        1. Applicability of *Heck v. Humphrey*

   Defendants first argue that pursuant to the Supreme Court's decision in *Heck v.*

*Humphrey*, 512 U.S. 477 (1994), Plaintiff's claim for excessive force is barred by his conviction

in New York state court for menacing in the third degree.  (Mem. of Law in Supp. of Defs.' Mot.

for Summ. J. ("Defs.' Mem.") 2-3.)  In *Heck*, the Supreme Court explained that

> in order to recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness would
> render a conviction or sentence invalid, a § 1983 plaintiff must prove that the
> conviction or sentence has been reversed on direct appeal, expunged by executive
> order, declared invalid by a state tribunal authorized to make such determination,
> or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. at 486-87 (footnote omitted).  Of course, *Heck* "does not require dismissal of any claim whose adjudication in favor of the plaintiff would not necessarily invalidate his conviction or sentence."  *Smith v. Fields*, No. 95-CV-8374, 2002 WL 342620, at *4 (S.D.N.Y. Mar. 4, 2002). Defendants argue that "[P]laintiff's conviction of menacing would be invalidated if he were to prevail on a claim of excessive force."  (Defs.' Mem. 3.)

"It is well established that an excessive force claim does not usually bear the requisite relationship under *Heck* to mandate its dismissal."  *Smith*, 2002 WL 342620, at *4 (collecting cases); *see also Greenfield v. Tomaine*, No. 09-CV-8102, 2011 WL 2714221, at *7 (S.D.N.Y. May 10, 2011) ("[A] claim for 'the use of excessive force lacks the requisite relationship to the disciplinary sentence' necessary to invocation of the *Heck* rule." (alteration omitted) (quoting *Jackson v. Suffolk Cnty. Homicide Bureau*, 135 F.3d 254, 257 (2d Cir. 1998)).  As the "police might well use excessive force in effecting a perfectly lawful arrest[,] . . . a claim of excessive force in making an arrest does not require overturning the plaintiff's conviction even though the conviction was based in part on a determination that the arrest itself was lawful."  *Greenfield*, 2011 WL 2714221, at *7 (internal quotation marks omitted).

Here, the excessive force claim does not bear the "requisite relationship" to Plaintiff's conviction for menacing in the third degree.  The jury was instructed that it should convict Plaintiff of menacing DiMilia in the third degree if it found: (1) that Plaintiff "by physical menace placed or attempted to place John DiMilia in fear of death or imminent serious physical injury or imminent physical injury"; and (2) that Plaintiff "did so intentionally."  (Meehan Decl Ex. K., at 1032.)  "[A]n officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756,

762 (2d Cir. 2003) (internal quotation marks omitted); *see also Biggs v. City of New York*, No. 08-CV-8123, 2010 WL 4628360, at *3 n.7 (S.D.N.Y. Nov. 16, 2010) ("Under federal law, a police officer is authorized to use deadly force if the suspect threatens the officer with a weapon or poses a threat of serious physical harm, either to the officer or to others." (internal quotation marks omitted)).  Because the jury did not specify what exactly Plaintiff did that menaced DiMilia, the Court cannot rule out the possibility that the jury found that Plaintiff placed DiMilia in fear of "imminent physical injury."  If this is the case, Defendants' use of force could be found excessive without invalidating Plaintiff's conviction for menacing, as the use of deadly force to respond to a threat of "imminent physical injury," as opposed to "death or serious physical injury," could be found excessive.

For this reason, a reasonable jury in this case could find that the shooting of Plaintiff by Algarin and Guedes was an excessive use of force, despite Plaintiff's conviction for menacing DiMilia.[16]

### 2.  Collateral Estoppel

Defendants next argue that Plaintiff's "conviction of menacing collaterally estops him from denying that he was in possession of a rifle and that he aimed that rifle at the defendant officers."  (Defs.' Mem. 4.)  Defendants argue that the state court jury determined that, at the time of his arrest, Plaintiff was in possession of a deadly weapon which he used to place the officers in fear of death or imminent serious physical injury, and that Plaintiff is now "collaterally estopped

---

[16] The Court notes that despite Defendants' contention that Plaintiff was convicted of using his rifle to place "the officers" in fear (Defs.' Mem. 3), Plaintiff was convicted of only menacing DiMilia.  Plaintiff was not convicted of menacing Algarin or Guedes — the officers who shot Plaintiff — who both testified at trial that they fired at Plaintiff because Plaintiff pointed his rifle at Algarin, and not DiMilia, whom neither Algarin nor Guedes could see during the incident.  (Meehan Decl. Ex. G, at 535, 575, 588-89; Meehan Decl. Ex. H, at 727-78, 731.)

from denying that he pointed the M1 carbon rifle at the defendant officers."   (Defs.' Mem. 4-5.)

The collateral estoppel doctrine "applies when § 1983 plaintiffs attempt to relitigate in federal court issues decided against them in state criminal proceedings." *Allen v. McCurry*, 449 U.S. 90, 102 (1980).  Because Plaintiff was convicted in New York state court, the Court must apply New York's rules of collateral estoppel.  *See Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000).  Under New York law, collateral estoppel applies "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action."  *Id.* (internal quotation marks omitted).  Thus, "collateral estoppel would bar [an excessive force] claim if the facts actually determined in the plaintiff's prior criminal conviction necessary to that judgment are incompatible with the claim of excessive force being raised in the subsequent civil suit." *Diggs v. N.Y. Police Dep't*, No. 04-CV-1849, 2005 WL 3533158, at *3 (E.D.N.Y. Dec. 22, 2005) (alterations and internal quotation marks omitted).  The Second Circuit has explained that "[t]he doctrine of collateral estoppel requires a detailed examination of the record in the prior state criminal case, including the pleadings, the evidence submitted and the jury instructions, in order to determine what issues were actually litigated and necessary to support a final judgment on the merits."  *Sullivan*, 225 F.3d at 166.[17]

Defendants' collateral estoppel argument suffers from the same deficiencies as their *Heck* argument.  Defendants ignore the possibility that the jury merely found Plaintiff guilty of placing DiMilia in fear of "imminent physical injury," and improperly assume that the jury necessarily determined that Plaintiff used the rifle to place the officers in fear.  In fact, the jury never

---

[17] It is this directive, among other things, that led the Court to request the transcript of Plaintiff's criminal trial.  (Order of Aug. 25, 2011 (Dkt. No. 107).)

provided the basis for the menacing conviction.  While Defendants may argue, with some

persuasion, that Plaintiff's use of the gun was the most likely means Plaintiff had at his disposal

to threaten the officers, the jury's verdict does not require drawing *only* this inference.  The issue

of whether Plaintiff pointed the rifle at anyone was not actually litigated in the state court action,

and the Court will not dismiss Plaintiff's claim on collateral estoppel grounds.

 However, some of the assertions made by Plaintiff in support of his claim are barred by

collateral estoppel.  For example, in his deposition, Plaintiff repeatedly asserted that he did not

have a rifle in his car or on his person on December 24, 2004.  (Pl.'s Dep. 78, 149, 243.)  Plaintiff

also claimed that he was convicted of only criminal possession of weapons that were found in his

house and that he was acquitted of all charges involving the M1 carbine rifle.  (Pl.'s 56.1 Resp. at

unnumbered page i.)  This is simply wrong.  Although the jury acquitted Plaintiff of the third

degree criminal weapon possession charge — which required a finding that he intended to use the

rifle unlawfully against another person — the jury did convict Plaintiff of the lesser included

offense of knowingly possessing that rifle.  (Meehan Decl. Ex. K, at 1089; Meehan Decl. Ex. L.)

Therefore, despite Plaintiff's contention that he was found guilty of only constructive possession

of the firearms in the house, the jury did find that Plaintiff possessed the rifle that Defendants

maintain he pointed at them; the jury merely did not find beyond a reasonable doubt that Plaintiff

intended to shoot the rifle.  Thus, Plaintiff is collaterally estopped from arguing that he did not

possess the rifle at the time in question, and his deposition testimony to the contrary can be

disregarded.  Additionally, Plaintiff is collaterally estopped from arguing that he did nothing at all

to put DiMilia in fear, as any such contention is squarely contradicted by the jury's verdict

convicting Plaintiff of menacing DiMilia.  *See Hardy v. Plante*, No. 06-CV-687, 2009 WL

249787, at *5 (N.D.N.Y. Feb. 3, 2009) ("While a court on a summary judgment motion must

credit all rational factual inferences in favor of the party opposing summary judgment,

[Plaintiff's] conviction . . . prevents him from asserting factual allegations or legal arguments that

have been litigated and decided against him in his criminal trial.").

### 3. Material Questions of Fact

Defendants next argue that Plaintiff's excessive force claim must be dismissed because

Defendants' use of force was reasonable as a matter of law.  (Defs.' Mem. 6-7.)  In cases where a

plaintiff claims "that law enforcement officials used excessive force in the course of making an

arrest, . . . such claims are properly analyzed under the Fourth Amendment's 'objective

reasonableness standard.'"  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  "The 'reasonableness'

of a particular use of force must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight," *id.* at 396, and must allow "for the fact that

police officers are often forced to make split-second judgments — in circumstances that are tense,

uncertain, and rapidly evolving — about the amount of force that is necessary in a particular

situation," *id.* at 396-97.  Thus, "[w]hen determining whether police officers have employed

excessive force in the arrest context, . . . courts should examine whether the use of force is

objectively unreasonable in light of the facts and circumstances confronting them, without regard

to the officers' underlying intent or motivation."  *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir.

2006) (alteration and internal quotation marks ommitted); *see also Amnesty Am. v. Town of W.

Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (explaining that in evaluating an officer's use of

force, the factfinder must determine if, "in light of the totality of the circumstances faced by the

arresting officer, the amount of force used was objectively reasonable at the time").  "Given the

fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive

force claim is not appropriate unless no reasonable factfinder could conclude that the officers'

conduct was objectively unreasonable." *Amnesty Am.*, 361 F.3d at 123.

As noted earlier, "an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan*, 352 F.3d at 762 (internal quotation marks omitted). "[I]f the suspect threatens the officer with a weapon . . ., deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). "The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996). "The objective reasonableness test will not be met if, on an objective basis, it is obvious that no reasonably competent officer would have concluded in that moment that his use of deadly force was necessary." *Pub. Adm'r of Queens Cnty. ex rel Guzman v. City of New York*, No. 06-CV-7099, 2009 WL 498976, at *5 (S.D.N.Y. Feb. 24, 2009) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The key determination of "reasonableness" here depends on which version of events one credits, specifically as to Plaintiff's location when he was shot. Given the testimony that: (1) Defendants had been told that Plaintiff had just threatened to shoot someone; (2) Defendants believed that Plaintiff might be intoxicated; and (3) Plaintiff had refused to pull over in response to Defendants' pursuit with activated lights and sirens, if Plaintiff did step out of his car with a rifle and point it at any of the officers, their use of deadly force was reasonable. *See Garner*, 471 U.S. at 11-12 ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible,

some warning has been given."); *Salim*, 93 F.3d at 91-92 (reversing denial of summary judgment because the defendant officer shot the decedent "instinctively in reaction to seeing [decedant's] hand on the barrel of his gun while the two were locked in a struggle" (internal quotation marks omitted)); *Biggs*, 2010 WL 4628360, at *4 (granting summary judgment for defendants, where plaintiff stepped out of his vehicle and began waving a thirteen-inch knife over his head "in a threatening manner" seven to eight feet from defendants, and did not comply with orders to drop the knife).  However, if Plaintiff's version is true — i.e., if Plaintiff was sitting in his car when he was shot — a reasonable jury could find that the use of deadly force was excessive.  *See Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *6 (S.D.N.Y. Nov. 29, 2004) (denying summary judgment, where plaintiffs "claim[ed] the shooting was provoked by little more than the appearance of Walter Hickey on his porch, with a cell phone strapped to his waist," while defendants "claim[ed] Walter Hickey emerged from his home, threatening to shoot them, and holding what appeared to be a gun in a firing position").

At the summary judgment stage, "it is undoubtedly the duty of district courts not to weigh the credibility of the parties."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment to defendants, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Bridgewater v. Taylor*, No. 08-CV-3593, 2011 WL 6762931, at *5 (S.D.N.Y. Dec. 21, 2011) (denying summary judgment to plaintiff where defendant's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Bennett v. Vaccaro*, No. 08-CV-4028, 2011 WL 1900185, at *7-8  (S.D.N.Y. Apr. 11, 2011) (denying summary judgment where defendants did not

establish that plaintiff's "testimony is, either on its face or in light of any other statements he has

made, so self-contradictory or implausible as to rule out crediting it," and there was no evidence

that plaintiff "ever contradicted his current version of his arrest"); *Butler v. Gonzalez*, No. 09-CV-

1916, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (denying summary judgment where,

although plaintiff's evidence was "minimal," and his allegations "suffer[ed] from a lack of

corroboration," there were no "material inconsistencies" in plaintiff's account); *Sash*, 674 F.

Supp. 2d at 541-42 (denying summary judgment because court did not find plaintiff's "version of

events to be so incredible, or in such discord with other evidence, as to find his allegations

'wholly fanciful,'" where plaintiff's claim relied "almost entirely" on his own, consistent,

testimony).  Indeed, courts have denied summary judgment to defendants even where a plaintiff's

version of the events is contradicted by substantial evidence.  *See, e.g.*, *DeBlasio v. Rock*, No. 09-

CV-1077, 2011 WL 4478515, at *13 (N.D.N.Y. Sept. 26, 2011) (denying summary judgment

where plaintiff relied exclusively on his own testimony, which was contradicted by evidence

produced by defendants, because plaintiff's complaint and deposition testimony were

"moderately contradictory," but far less contradictory than the testimony at issue in decisions

granting summary judgment); *Bennett v. Falcone*, No. 05-CV-1358, 2009 WL 816830, at *5

(S.D.N.Y. Mar. 25, 2009) (denying summary judgment where plaintiff's story was "certainly

inconsistent with other evidence and [was] subject to serious question," but was "not so blatantly

false that the Court may simply reject it as a matter of law" (internal quotation marks omitted));

*Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *5-6 (S.D.N.Y. Sept. 30, 2008)

(denying summary judgment where defendants' testimony, third-party eyewitness testimony, and

other evidence contradicted plaintiff's uncorroborated version of events, because plaintiff's story

did not have any "fatal internal inconsistencies").

However, "there is an exception for the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." *Fincher*, 604 F.3d at 725-26 (internal quotation marks omitted); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104-05 (2d Cir. 2011) ("Although a district court generally should not weigh evidence or assess the credibility of witnesses, . . . in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." (citation, alterations, and internal quotation marks omitted)); *Jeffreys*, 426 F.3d at 555 (affirming grant of summary judgment where there was "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony"); *Butler*, 2010 WL 3398156, at *8 (noting that courts have granted summary judgment where there was "(1) a plaintiff whose own story was internally inconsistent and changed throughout the proceedings; (2) substantial evidence undermining or directly refuting the plaintiff's version of events; and (3) defendants who submitted affidavits or declarations categorically denying the plaintiff's version of events" (citations omitted)).

Plaintiff has consistently alleged throughout this litigation that he was shot while sitting in his car, unarmed.  (Pl.'s Dep. 81; Pl.'s Aff. 1; Pl.'s Reply at unnumbered page 2; Letter from Pl. to Ct. (Oct. 20, 2011); Letter from Pl. to Ct. (Nov. 22, 2011); Pl.'s Notice of Protest 2; Compl. ¶ 79.)[18]  Plaintiff did make inconsistent statements during his hospital interview with Golding,

---

[18] As the Court notes below, Plaintiff's testimony is sufficient to create a genuine issue of material of fact on its own.  Therefore, the Court does not need to address Defendants' argument that Haase's criminal trial testimony is inadmissible for the purpose of these motions.  (Defs.' Supplemental Mem. of Law in Resp. to the Ct.'s Oct. 5, 2011 Order 6 (Dkt. No. 125).)

where Plaintiff stated that all he did "was get out of [his] car and they shot [him]"; that it was his "right to have a rifle"; and that "he turned to walk towards his house and they started firing at him." (Meehan Decl. Ex. J, at 462-63.) However, Plaintiff did not adopt any writing of what he had said (and, in fact, denies making those statements), and it is undisputed that during this conversation, Plaintiff was being treated by medical personnel for wounds to his hand, his arm, and a portion of his back, and was complaining about pain in his upper back. (*Id.* at 465, 470.) Plaintiff notes that at the time of the alleged interview he "was under the influence of Morphine, having lost 2 ½ pints of blood, been shot 6 times, and [was] presumably on his death bed having been given his last rites," (Pl.'s Aff. 2), and was "heavily sedated," (Pl.'s Notice of Protest 3).[19] Indeed, as noted, Plaintiff has denied making these statements to Golding. While there may be serious questions about the credibility of this denial, its test will have to wait the enlightenment of cross-examination before a jury. The Second Circuit has held that "if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426 F.3d at 555 n. 2 (alteration, emphasis, and internal quotation marks omitted). The Court finds Plaintiff's explanation of the discrepancies plausible, though by the barest of margins.[20]

---

[19] The trial testimony of the nurse who treated Plaintiff in the hospital indicates that morphine was given prior to 7:00 a.m., when she came on duty. (Tr. of Tina Montanye's Trial Testimony 689 (Dkt. No. 113 Ex. 9).) Golding testified that he began speaking to Plaintiff at 8:37 a.m. (Meehan Decl. Ex. J, at 469.)

[20] In moving to dismiss the counts against Plaintiff at the conclusion of the Government's case-in-chief in Plaintiff's criminal trial, Plaintiff's lawyer argued that "[t]he evidence seems to suggest that [Plaintiff] came out of the car holding a weapon, and there really was no evidence that he did anything with that weapon to menace the police officers." (Trial Tr. 812.) Plaintiff's criminal trial counsel also argued in an affidavit submitted during the criminal trial (which

Another inconsistency relates to where the first bullet hit Plaintiff.  Plaintiff has claimed

during this litigation that the first bullet hit him either in the center of his back, (Pl.'s Aff. 1;

Letter from Pl. to Ct. (Oct. 20, 2011)), or just to the left of his spine, (Pl.'s Dep. 82, 124).  It is

undisputed that when Plaintiff was treated in the emergency room immediately after the shooting,

he had a wound in his right upper back, "pretty much directly behind" the wound on his front

---

Plaintiff submitted as an attachment to his 56.1 Response in this litigation) that the police did not
have probable cause to search Plaintiff's house for weapons merely because "the police
recovered a rifle from [Plaintiff] outside his house as he was exiting his automobile."  (Pl.'s 56.1
Resp., Hirsch Aff.)  "Statements made by an attorney concerning a matter within his
employment may be admissible against the party retaining the attorney."  *United States v.
Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981); *see also Getty Petroleum Corp. v. Island Transp.
Corp.*, 878 F.2d 650, 656-57 (2d Cir. 1989) (affirming district court's instruction to jury that it
could consider concessions of defendant's counsel in his opening statement as concessions by
defendant itself); *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) ("Generally,
statements by an attorney concerning a matter within his employment may be admissible against
the retaining client.  Further, a clear and unambiguous admission of fact made by a party's
attorney in an opening statement in a civil or criminal case is binding upon the party." (citations
omitted)); *United States v. Ganadonegro*, No. 09-CR-312, 2012 WL 592168, at *34 (D.N.M.
Feb. 14, 2012) (permitting defendant to offer government's statement during closing arguments
of prior mistrial in subsequent criminal trial); *Gen. Ins. Co. v. Mezzacappa Bros.*, No. 01-CV-
7394, 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003) (granting summary judgment to
plaintiffs where defense counsel conceded at oral argument that defendant had not submitted
sufficient evidence to survive summary judgment); *Skagen v. Sears, Roebuck & Co.*, No. 87-CV-
3099, 1989 WL 88392, at *2 (N.D. Ill. July 26, 1989) (granting summary judgment to defendant
where plaintiff's counsel's admission "fatally wounded" his claims, noting that statements of
counsel may be considered by a court deciding a motion for summary judgment).  However, the
Second Circuit has "circumscribe[d] the evidentiary use of prior jury argument," and instructs
district courts to admit statements by counsel in a prior trial only if "the prior argument involves
an assertion of fact" that is clearly inconsistent with similar assertions in a subsequent trial.
*United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984).  "Speculations of counsel, advocacy as
to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or
invitations to a jury to draw certain inferences should not be admitted."  *Id.*  Examining the
statements by Plaintiff's counsel detailed above, the Court finds that they are properly
characterized as speculation of counsel or arguments as to weaknesses in the prosecution's case,
not assertions of fact, and therefore will not attribute them to Plaintiff at this stage.  *See Martinez
v. Port Auth. of N.Y. & N.J.*, No. 01-CV-721, 2005 WL 2143333, at *11 (S.D.N.Y. Sept. 2, 2005)
(excluding plaintiff's counsel's closing argument statements in prior criminal trial, because
"remarks were couched purely as supposition and suggestion" and fell "within *McKeon*'s
concerns as to not admitting speculations of counsel or invitations to draw inferences").

shoulder.  (Tr. of Tina Montanye's Trial Testimony 678 (Dkt. No. 113 Ex. 9).)[21]  This minor inconsistency over whether the wound was in the right or left side of Plaintiff's back does not by itself make Plaintiff's version of the events so fanciful that the Court may not credit it, especially since Defendants have not introduced any evidence showing Plaintiff could not have been shot in the right upper back while seated in his car.

Plaintiff's testimony is "certainly inconsistent with other evidence and is subject to serious question," but is "not so blatantly false that the Court may simply reject it as a matter of law." *Falcone*, 2009 WL 816830, at *5.  Nor is it so "contradictory or rife with inconsistencies such that it [is] facially implausible."  *Fincher*, 604 F.3d at 726 (internal quotation marks omitted). Defendants' motion for summary judgment is denied, even though the available evidence casts a very dark cloud on Plaintiff's version of events.  *See Cowan*, 352 F.3d at 763 (denying summary judgment motion where the determination of whether the defendants used excessive force "turn[ed] on which of two conflicting stories best captures what happened on the street" (internal quotation marks omitted)).

While the Court is not prepared to say that Plaintiff's version of events is internally inconsistent (at least in his deposition and written submissions to this Court) or hopelessly fanciful, it suffices to say his version of events will find little support, if any, in the record of this case or his criminal case.  Indeed, Plaintiff will have to defend his story under oath, and he faces all that comes with that responsibility.  In the meantime, Plaintiff's motion for summary judgment also is denied for the simple and obvious reason that his version of events faces an avalanche of

---

[21] It was stipulated at Plaintiff's criminal trial that Plaintiff received gunshot wounds "to the right forearm, to the right arm between the elbow and shoulder, to the right shoulder and an area of the right scapula," as well as "a laceration to the webbing between the right thumb and right index finger."  (Meehan Decl. Ex. K, at 1011-12.)

contradictory evidence.  *See U.S. Commodity Futures Trading Comm'n v. Hunter*, No. 07-CV-6682, 2012 WL 297838, at *2 (S.D.N.Y. Jan. 31, 2012) (denying the parties' cross-motions for summary judgment because material issues of fact existed); *Granvia Trading Ltd. v. Sutton Creations, Inc.*, No. 08-CV-580, 2010 WL 4630266, at *1 (S.D.N.Y. Nov. 11, 2010) (same).

### 4.  Qualified Immunity

Defendants also argue that summary judgment should be granted because they are entitled to qualified immunity.  (Defs.' Mem. 8-9.)  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted); *see also Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) ("[Q]ualified immunity shields police officers acting in their official capacity from suits for damages . . . unless their actions violate clearly-established rights of which an objectively reasonable official would have known.").  "[Qualified] immunity 'protect[s] government's ability to perform its traditional functions' . . . by helping to avoid 'unwarranted timidity' in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits."  *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012) (second alteration in original).  It allows public officials "to perform their duties unflinchingly and without constant dread of retaliation."  *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010).

However, "[b]ecause in this case genuine, material, factual disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied."  *Cowan*, 352 F.3d at 764 (denying summary judgment on qualified immunity grounds having already

determined in the excessive force analysis that there were disputed facts regarding the reasonableness of the officer's conduct); *see also Benson v. Yaeger*, No. 05-CV-784, 2009 WL 1584324, at *7 (W.D.N.Y. June 3, 2009) ("[T]he only issue is whether the Officers' conduct was objectively reasonable — the very question upon which this Court has found there are genuine issues of material fact.  Because the factual disputes as to the objective reasonableness of the Officers' conduct overlap in both the excessive force context as well as the qualified immunity context, summary judgment must be denied here."); *Falcone*, 2009 WL 816830, at *6 ("For the same reasons Plaintiff's excessive force claim survives summary judgment, the Court holds Defendants' qualified immunity claim insufficient."); *Pierre-Antoine*, 2006 WL 1292076, at *6 (noting that if plaintiff's account were credited, "which is for the jury to determine," qualified immunity would be unavailable).

          5. DiMilia

          In their reply in support of their motion, Defendants assert that any claims against DiMilia should also be dismissed because DiMilia did not fire at Plaintiff.  (Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. 8.)[22]  It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted).  "A police officer is personally involved in the use of excessive force if he either: (1) directly

---

          [22] Defendants did not make this argument in their initial memorandum of law, nor in their memorandum of law in opposition to Plaintiff's motion.  Defendants should be mindful that the Court usually "will not consider an argument raised for the first time in a reply brief."  *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003).  However, in this case, it is clear that Defendants' contention is correct, and Plaintiff has had ample opportunity and a demonstrated ability, in light of his many, many post-briefing submissions to the Court, to respond to Defendants' claim.

participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003).

Plaintiff has never suggested that DiMilia fired a shot at him, nor is there any evidence that DiMilia fired his gun at any point during the incident. And, it is clear from the record that DiMilia did not have time to intervene before any shots were fired, and Plaintiff does not argue otherwise. DiMilia testified that when he saw Plaintiff lean over and pick up a rifle from the passenger's seat, DiMilia ran back behind Algarin's vehicle for cover. (Meehan Decl. Ex. F, at 407-08.) DiMilia heard Algarin yell for Plaintiff to drop the gun (*id.* at 411), and when DiMilia heard shots, he ducked his head behind the patrol car, (*id.* at 412). There is nothing to suggest from this undisputed evidence that DiMilia would have been able to intervene, and Plaintiff does not allege any facts suggesting otherwise. Accordingly, summary judgment is granted as to DiMilia alone, and he is dismissed from the case. *See Guzman*, 2009 WL 498976, at *11 (dismissing, at the summary judgment stage, plaintiff's excessive force claim as to individual officer, where plaintiff did not "adequately establish [the individual officer's] direct participation in the use of force or a reasonable opportunity to intercede").[23]

### III.  Conclusion

For the reasons discussed above, both motions for summary judgment are denied, except for Defendants' motion for summary judgment as to DiMilia, which is granted. The Clerk of

---

[23] Defendants also argue that Plaintiff has failed to establish a claim against the Town of Wallkill under the doctrine of municipal liability set forth in *Monnell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978), (Defs.' Mem. 10-11.) However, Plaintiff has never named the Town of Wallkill as a defendant in this case, nor suggested at any point that he intended to sue the municipality. Accordingly, the Court has not addressed Defendants' argument.

Court is respectfully directed to terminate the pending motions (Dkt. Nos. 72, 109), and enter judgment for Defendant DiMilia.

SO ORDERED.

Dated:      White Plains, New York
            September **13**, 2012

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (via Mail by Clerk's Office)

Anthony Crivello Russo
DIN #05-A-5228
Franklin Correctional Facility
PO Box 10
62 Bare Hill Road
Malone, NY 12953
*Pro Se Plaintiff*

Brian S. Sokoloff, Esq.
Kiera J. Meehan, Esq.
Steven C. Stern, Esq.
Sokoloff Stern LLP
355 Post Avenue, Suite 201
Westbury, NY 11590
(516) 334-4500
Fax: (516) 334-4501
Email: bsokoloff@sokoloffstern.com
         kmeehan@sokoloffstern.com
         sstern@sokoloffstern.com
*Counsel for Defendants*